May it please the Court, Counsel. Kendra Matthews, excuse me, with Ransom Blackman on behalf of Mr. Hernandez-Torres in this consolidated matter. In this case, 10 to 15 minutes before officers could have had a warrant at the scene, they chose instead to jump the gun, secure his property, and go into his backyard, an area that is indisputably protected by the Fourth Amendment as curtilage of his home. Counsel, I'd like just some more information about just the description of the premises and that backyard, and it's not clear from the record as to whether these facts were presented, but you'll be able to respond to that for me. Was there a fence surrounding the backyard? Was there a gate? What was the condition of the gate, or was the backyard just right off the street, so you could have stood on the street and seen the activity in the backyard? Your Honor, as to the final point, I'm confident that you could not stand from the street and see what the officers could have seen from the backyard. The record is not well developed as to exactly what the scene appeared to be, but the officers were in a backyard that they did not have to enter through a fence, but that I believe had either woods or shrubbery, and it was a very defined backyard. And the reason that the record was not developed is that the government from the outset agreed that it was curtilage protected by the Fourth Amendment. And so I apologize that I can't give you a better description of what it looked like, but my impression is that you sort of scooted to the side of the house and that there was not a fence there, and that's clear from the record, but that you did then go into a clearly defined backyard area and that the officers were about 20 feet back, I believe is what the record would reflect, into a backyard area that was private to this residence. What's your response to the argument that had officers not gone into that backyard area that there may have been a chance of flight as far as the defendant is concerned? Well, our contention is that these officers acted as a unit and that the decision was to secure the property, and the decision was to make contact and enter the backyard. I guess directly the answer is there was no exigent circumstance at the moment that the officers decided to secure the property that would prompt them to jump the gun on the warrant and would prompt them to think that there was a risk of flight out of the back of the residence. There was no information relating to the back of the residence, and so our position was at the time they acted, they had nothing but speculation that anything would happen to the evidence they believed was in the home in the 10 to 15 minutes or 15 to 30 minutes it would take to get the warrant there, and the warrant did arrive in that 30 minutes. They suggested that drugs move very quickly and just gave a generalized proposition that these people had returned from a trip, they were in the house, and they were concerned that they would leave the house before the warrant arrived. Well, weren't they concerned about a phone call coming in because of the arrest of the party that was driving that, or whatever it was, that jeep? Well, Your Honor, of course the burden is on the government, and they did demonstrate that they executed a traffic stop on a jeep that had left the property. And there was a cell phone. And they seized that cell phone, and they gave no evidence suggesting that that cell phone had been used or any evidence that these individuals had any means of contacting the residents or that they had or that they would. Again, it was just sort of a general speculation that these are sophisticated drug dealers. And where did these individuals, weren't they at the residence earlier? There were actually three people at the residence who the officers saw leave. They stopped one of them who was in a jeep, and then other people left in a cab. And who were the other people? Who were the other people in the residence or at the leaving? They're not identified in the record as far as I recall. It was a woman and a child left in a cab, and then another individual left in a jeep. A traffic stop was effectuated in that jeep. He did have drugs, methamphetamine, and a weapon and a cell phone. Is it also true that that information was not communicated to any of the officers who were at the house? That is correct, Your Honor. How do you know that? How do you know it wasn't communicated? The order came from the officer who was obtaining the warrant. And he ordered, you officers at the residence, secure the residence, freeze the property. Other officers, execute this traffic stop. Everybody take action. And as far as the record reflects, that is what happened. They didn't do it in sequential order. Again, their basis and their assertion was, we were concerned that property and evidence would leave the scene. And I suppose, although this is not in the record, it may be reasonable to say that the officers believed, if we execute the traffic stop and then secure the residence, that could be problematic. But they did not communicate that. But is it not a reasonable inference that if you're going to make the traffic stop, that that's going to tip off the people inside? You don't know that they're going to call, but it's certainly not unlikely that when they see the police closing in, that they'll tip off the people at the house. Well, the traffic stop was not made in the line of sight of the residence, and the traffic stop was initially executed as a routine traffic stop. You mean they had no intention of stopping them until it was a traffic violation? I thought the officer said, you know, to stop the car. Well, certainly as a pretext stop. Yes. Of course. But as my impression from the record, and counsel will, I'm confident, correct me if I'm wrong, is that they executed a traffic stop, which is to say, and then moved through. But you know what the purpose of a traffic stop is in a drug case. Certainly. But certainly, I can assure you that many, many defendants are stopped in traffic stops, and the investigation continues for months and months, and they believe what bad luck I have. I keep getting traffic stops. Fortunately, you know, they sometimes even seize property, seize the car, and the defendant moves on. Yeah, but this investigation had progressed to pretty far, and the officer was going over to a judge's house to get the warrant, which you've got to commend them for, because most of the time they just say their exigent circumstances, knock on the door and grab us and go out the back door. That's a routine. And, Your Honor, but for the decision to jump the gun when there wasn't anything more than speculation that they needed to violate his constitutional rights by entering his backyard, certainly they could have obtained the warrant, they should have obtained the warrant. Well, I'd like to pursue this with you a bit, because this is what bothers me, and maybe you can answer it. If you say we're going to implement a plan where we're going to stop some of the people who are leaving, and we'll call it a traffic stop, but we know and they know we're looking for drugs, why isn't that a reason to say to the officers, you know, when we do that, you should move in? Because there's a likelihood that the people at the house are going to find out that this is what we're doing. Well, you know, our position is that they just had nothing more than that speculation about how traffic, excuse me, traffic, now I'm saying drug organizations generally work, that they would have been immediately notified. Well, but they had information that this fellow was in the business. That the defendant, that the residence was in the business. They had information that people had gone to the house and that three individuals had left, and they chose to stop one of those individuals. It was not a car that they had seen at the hotel or, you know, had any individualized speculation on. I'll reserve my 20 seconds in case something. Thank you. All right. Please, the court and counsel. Kelly Zusman representing the United States. The issue in this case is whether or not we violated the Fourth Amendment  Do you agree with counsel that the record just simply isn't developed as to why it was necessary to go into the backyard in terms of whether the officers could have just remained outside on the sidewalk, they could have stopped anybody who was trying to leave the house and therefore leave the backyard, and they didn't need to actually enter the backyard? I think the record is sufficiently developed, Your Honor. In fact, Detective Newert testified, and I believe this is at ER 54, that when he heard the commotion going on in the backyard, he immediately left the front porch, ran around the garage to the left side of the residence, and entered into the backyard completely unobstructed. No one had to scale a fence or open a gate to get back there. So that side of the residence we know was completely open. Now, I'm sorry. What caused them to go into the backyard? They went to the backyard initially. We have four officers. Two go to the front door in order to contact the residence. Two are sent to the back to make sure that no one leaves out the back. Okay. But you do agree that counsel said he stipulated that if you had no cause to do it, it would be a Fourth Amendment violation. It was the curtilage. I'm not sure. We do agree that the backyard was protected pursuant to the Fourth Amendment. We agree that the backyard is curtilage. No. We don't agree that going into the backyard violated the Fourth Amendment. No, because you had exigent circumstances. Correct. What are the – what were the exigent circumstances as you say it? There were – part of it is that everything was happening very, very quickly. We know that this defendant was packaging drugs and repackaging drugs at a nearby motel. He'd been gone for several days. We believed he had gone down to California to get another supply of drugs. They'd had surveillance on the residence for a number of days. There was no activity there whatsoever. All of a sudden, they see lights on in the house and in the garage, and they realize somebody's back in town. Now, as they're watching the house, that's when Senior goes to get the warrant. And their plan, and this is at ER 51, the plan was to simply stay there and watch the residence until Senior got back. Now, that changed because of what unfolded before them. We have the white Jeep leaving the garage. They don't know who's in the Jeep. It might be the defendant. It might be somebody else. Their team of four then breaks up. Two of them go to effectuate the traffic stop on the Jeep. The other two stay. They see two other individuals leave in a taxi cab, the woman and the child. At that point, they don't know who's left, but they're concerned because this is a mid-level drug dealer who's been repackaging drugs. This is not someone who's dealing user quantities out of his house. This is someone who's proven himself to be savvy about detection. Remember, he's washed all of those bags when he repackaged them at the motel. So their concern is their best chance of getting those drugs is when they're with the defendant. If the defendant leaves, in all likelihood, he's going to be leaving with those drugs. So based upon the activity, Siener and Newert, who's at the scene, decide, we've got to take some action. We've got to make sure nobody leaves the residence. And the district judge here, I think, was particularly impressed with the measured response. These officers didn't say, oh, we've got exigent circumstances. Let's go break down the door. What they did was they decided to contact the residence, let them know, we've got an officer who's getting a warrant. It's going to be here any minute. In fact, it was there within 15 minutes, so nobody leave. What happened that I don't think anybody could have anticipated is that the defendant, upon hearing the knock at the door, says, who's there? The officer says, Springfield Police. All of a sudden, he runs into the garage, and they hear a commotion. Now, at that point, the district judge said, you definitely had exigent circumstances then, because in all likelihood he was going into the garage to destroy that evidence. Shortly thereafter, he attempts to leave and back. Those two police officers are 20 feet behind the back door. They're not there to gather evidence. They're not making observations that are later used in a search warrant. They're just watching the back door. But it's a seizure by them. Yes, absolutely. So the question is whether it was a lawful seizure at the time they went into the backyard. Correct. And that's before he ran out and went into the garage and all that. That's correct. But remember, these events are happening very, very quickly. So what are the circumstances that required the officers or caused the officers to enter the backyard? The circumstances were their concern that either the drugs had just left the residence in the Jeep or that the Jeep could have alerted the residence. And on that point, this is at ER 38 and 39, this is what Detective Senior testified to. Once law enforcement intervention starts and we are no longer in a surveillance mode, then the phone train starts, and the likelihood of my suspect learning of us being in the area has greatly increased. Do you agree that there is no evidence in the record that there was any communication by the officer who stopped the vehicle where they found drugs and the other items with those officers who were at the house? Yes, that's correct. These things were happening simultaneously. But did they know that he was going to stop the vehicle? Yes, yes. There was a decision by the four officers present that the other two, they were definitely going to be stopping that Jeep. I think the district court here analyzed the totality of the circumstances and properly concluded that the officer's response to this situation was both measured and reasonable and therefore fully in compliance with the Fourth Amendment. Unless there are any other questions from the court, I'll submit. Yeah, this had some very interesting facts where he runs out the back door with a whole bucket of meth pills and then turns around, runs back into the house, tries to go through the front door and then spills all the pills on the ground. I don't think it happens very often that a defendant with a bucket full of drugs runs into a police officer and then the evidence ends up on the carport. As an aside, the defendant was, in fact, separately charged with assault on the officer in Lane County. He was? Yes. What did you say? Mr. Hernandez-Torres was separately charged with assault in Lane County for what happened with the officer. Oh. So that's not important for us in terms of the issues that we have to decide, right? That's correct, Your Honor. It's not relevant to our Fourth Amendment determination. All right. Thank you. Thank you. I will simply take my 20 seconds to note that counsel did point out a fact that is in the record at ER 54 that one of the officers who knocked on the door in response to what appeared to be exigent circumstances then injured the backyard, and that certainly would have been a more constitutional approach as opposed to setting up people without any basis in the backyard in violation of the constitutional rights of the defendant. So from that, we should conclude that the entry into the backyard initially was not a violation of the Fourth Amendment? No, it was a violation of the Fourth Amendment because they had no basis at the time that they entered the backyard. I don't quite understand. Do you mean if they had knocked and then entered the backyard, as soon as they knocked, there'd be no violation? I'm suggesting only, Your Honor, that the circumstances that were presented to the officers at the time that they were sitting outside without any injury to the property. No, that's not very specific. My question is, if they had first knocked and then entered the backyard, would there have been a violation? Yes, I think there still would have been a violation. It would have been a step removed from this situation, although if they saw the defendant running out the backyard, that would have been a pursuit case, a different situation. It might be a little late. If they saw him running, I had to wait until he ran. Well, based on the facts of this case, at what point would you say it was appropriate for the officers to enter the backyard in other words, exigent circumstances existed? We're getting very close to the point that I was pointing to, that counsel pointed to in the record. I'm just trying to remember the officers, if the officers at the front door saw him running out of an exit at the back door, that would be appropriate. Well, the officer that knocked on the front door went around the back? Yes, one of them did. He was not one of the officers who confronted them. Oh, I know that. They went around the back, and did he see the defendant go out the back? I do not believe so. I believe he made the decision to exit, to go around the back of the house. In other words, they heard. When that officer who knocked on, what's the name of the officer who knocked on the front door again? There were two officers. Well, that's all right. Forget about that. Officer Newark. So when he knocked on the front door and announced his presence, and his presence was acknowledged, did he then go around the back? One officer remained in front, one officer remained in back. There were actually four officers. There were one in the back. All right. So what was the timing on that? The timing was actually that the officers knocked at the front door. There were officers positioned already in the back of the house. No, I mean when the guy who knocked on the front door went around the back, and then the defendant scooted out the back door with a bucket of pills. Who got there first? I believe that the officer who was going around the back did not have an encounter with the defendant. He encountered the officers who had positioned themselves in the back and then returned to his house. Everyone went to the front of the property. All right. Thank you. Thank you. And we'll take up the next case. All right. Thank you.
judges: Pregerson, Reinhardt, Marshall